# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| DRESSEL ASSOCIATES, INC., | ) | |
| | ) | |
| Debtor, | ) | |
| | ) | |
| JEFFREY J. SIKIRICA, | ) | Civil Action No. 14-1736 |
| *Chapter 7 Trustee*, | ) | |
| | ) | *Appeal from:* |
| Appellant, | ) | |
| | ) | Bankruptcy Case No. 11-22844 |
| v. | ) | |
| | ) | |
| MIDTOWN NIKI GROUP, | ) | |
| REA MODESTO, LP, and | ) | |
| BASHMART, LLC, | ) | |
| | ) | |
| Appellees. | ) | |

## MEMORANDUM OPINION

CONTI, Chief District Judge.

## I. INTRODUCTION

The matter pending before this court is an appeal from the November 19, 2014 Memorandum Opinion (ECF No. 1-14) and Order (ECF No. 1-20) issued by the United States Bankruptcy Court for the Western District of Pennsylvania and entered in Bankruptcy Case No. 11-22844. The bankruptcy court dismissed, with prejudice, the May 1, 2013 complaint (ECF No. 1-1) filed by Appellant Jeffrey J. Sikirica, Chapter 7 Trustee (the "Trustee") for Debtor Dressel Associates, Inc. (the "Debtor"), against Midtown Niki Group ("Midtown"), REA Modesto, LP, and Bashmart, LLC (collectively, "appellees"), seeking to avoid an allegedly

fraudulent transfer made in violation of state and federal law. This court has jurisdiction over the present appeal in accordance with 28 U.S.C. § 158(a). Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409. For the reasons set forth, below, and following its review of the pleadings, submissions, and record, including the trial transcript, the court will affirm the decision of the bankruptcy court.

**II.   PROCEDURAL & FACTUAL BACKGROUND**

Debtor filed a petition under Chapter 11 of the United States Bankruptcy Code on May 2, 2011. (ECF Nos. 1-19 at 1; 3 at 10). Carlota Bohm was appointed as the original Chapter 11 trustee for Debtor. (ECF Nos. 1-14 at 19; 3 at 10). She engaged the services of Frederick McMillan, Debtor's controller and treasurer from 1993 through 2011, to collect all available financial information for various entities owned by Gary Reinert, Sr., including Debtor, and enter that information into Peachtree accounting software. (ECF No. 1-14 at 19 – 20, 34, 41, 60 – 61). Robert Shearer was appointed as successor Chapter 11 trustee for Debtor, and was re-appointed as the Chapter 7 Trustee when the case was converted to a Chapter 7 bankruptcy on January 27, 2012. (ECF Nos. 1-14 at 5; 1-19 at 1; 3 at 10). In his capacity as trustee, Mr. Shearer completed financial schedules for the Debtor. (ECF No. 1-14 at 5). The Trustee took over as Chapter 7 Trustee for Debtor on June 6, 2012. (ECF Nos. 1-19 at 2; 3 at 10).

Prior to filing for bankruptcy, Debtor accrued a liability of approximately $20 million, which it shared jointly and severally with a number of other entities owned by Mr. Reinert as a result of a United States District Court judgment in favor of Fifth Third Bank. (ECF No. 1-14 at 9 – 10). Financial records indicated that on July 15, 2010, between the date of the district court judgment and the date of the bankruptcy filing, $924,728.70 was deposited into Debtor's bank account. (ECF No. 1-14 at 31). Records also indicated that there was a pre-existing note

payable to Debtor by Mr. Reinert in the amount of $786,011.78. (ECF No. 1-14 at 65). Following the deposit, a negative balance of $138,716.92 was noted on the books of Debtor. (ECF No. 1-14 at 58). Subsequently, four separate transfers were made in the following amounts on July 16, 2010: $54,902.90, $433,338.61, $23,908.18, and $412,579.00. (ECF No. 1-14 at 31). The transfers totaled $924,728.69. The transfer of $412,579.00, which is the transfer at issue in this case, was made to Midtown. (ECF No. 1-19 at 2). Midtown then transferred $230,195.00 and $186,785.00, respectively, to REA Modesto, LP and Bashmart, LLC. (ECF No. 1-1 at 2 – 4).

Following an extensive review of Debtor's financial schedules, the Trustee discovered the existence of these transfers and filed a complaint against appellees on May 1, 2013. (ECF Nos. 1-1; 3 at 10). The Trustee alleged in the complaint that the transfer to Midtown constituted a fraudulent transfer made in violation of 11 U.S.C. § 548(a)(1)(B) ("§ 548(a)(1)(B)") and 12 PA. CONS. STAT. § 5105 ("Section 5105"). The Trustee believed Debtor was entitled to avoid that transfer, and sought the return of the monies paid to appellees. The matter ultimately went to trial on August 25, 2014, at which time various parties involved in Debtor's bankruptcy testified. (ECF No. 1-14).

Mr. Shearer was the first witness called. Mr. Shearer testified that he was primarily responsible for preparation of the Debtor's financial schedules for the bankruptcy court, and that he relied upon Debtor's business records as compiled in the Peachtree accounting software, and consulted with Mr. McMillan and Mr. Reinert. (ECF No. 1-14 at 5 – 6, 15). Neither individual provided Mr. Shearer with any significant information related to the transfers at issue. (ECF No. 1-14 at 8 – 9). Mr. Shearer admitted that he was unaware whether the Peachtree files were prepared according to generally accepted accounting principles. (ECF No. 1-14 at 13, 15). He

3

acknowledged that the schedules did not include a fair market valuation of Debtor's assets, any indication about what liabilities existed prior to July 16, 2010, or any indication about whether Debtor's liabilities were contingent or disputed. (ECF No. 1-14 at 15 – 17). He testified that Mr. Reinert, and his personal accountant Edward Lukert, informed him that there were numerous errors in the completed schedules; however, no specific errors were ever identified by Mr. Reinert. (ECF No. 1-14 at 10). Mr. Shearer believed Mr. Reinert's claims to be an unsubstantiated "ploy." (ECF No. 1-14 at 10). Mr. McMillan never noted any errors to Mr. Shearer. (ECF No. 1-14 at 11). Upon review of the schedules during testimony, Mr. Shearer conceded that he did not sign Debtor's financial schedules under penalty of perjury, and that the attached verification statement indicated that the financial schedules were not to be construed as an "admission" by Debtor. (ECF No. 1-14 at 12). Nonetheless, Mr. Shearer felt that he prepared the schedules to the best of his ability, under the circumstances, and that the schedules were "as accurate as they can reasonably be." (ECF No. 1-14 at 12).

The Trustee testified following Mr. Shearer, and indicated that he had been appointed as successor trustee to Mr. Shearer. (ECF No. 1-14 at 19). The Trustee stated that subsequent to a review of the financial data contained in the Peachtree accounting database, as well as the financial schedules provided by Mr. Shearer, he decided to avoid the transfers as fraudulent transfers. (ECF No. 14-4 at 20). He discovered that a payment was made by Debtor for lease obligations of another entity – Dressel Associates, LLC. (ECF No. 1-14 at 20). The payment was made to several parties, including appellees. (ECF No. 1-14 at 21). The Trustee testified that he was originally led to believe that the $924,728.70 deposited into Debtor's bank account was unrelated to Debtor or its obligations, and that the money was intended to be distributed for lease obligations owed by Mr. Reinert for other business purposes. (ECF No. 1-14 at 32).

4

Ultimately, the Trustee disregarded this information, because he did not believe that Debtor's financial records corroborated this explanation. (ECF No. 1-14 at 32). The Trustee, however, acknowledged that some of Debtor's liabilities may have been contingent, and that Debtor was only one of several parties liable for the $20 million judgment in favor of Fifth Third Bank. (ECF No. 1-14 at 28 – 29). The Trustee could not speak to the valuation or liabilities of those other parties. (ECF No. 1-14 at 30).

Mr. McMillan testified about his efforts in accounting for Debtor's liabilities and assets during the bankruptcy proceedings. He characterized the transfers at the heart of this case as an attempt to keep certain of Mr. Reinert's business interests operating by paying off past balances on various leases. (ECF No.1-14 at 36, 44). According to Mr. McMillan, Mr. Reinert created the entity Dressel Associates, LLC on July 1, 2010, for the purpose of assuming responsibility for those leases. (ECF No. 1-14 at 36, 43 – 44). Due in part to the timing of the creation of Dressel Associates, LLC, that entity did not have its own bank account. (ECF No. 1-14 at 36). As such, Mr. Reinert used Debtor's bank account to make lease payments in Dressel Associates, LLC's name. (ECF No. 1-14 at 36, 46). Mr. McMillan stated that the amount deposited into Debtor's account was not for the payment of an obligation owed by Mr. Reinert to Debtor. (ECF No. 1-14 at 50 – 51).

Financial books were never set up for Dressel Associates, LLC, and only Debtor's books reflected the transactions. (ECF No. 1-14 at 57). Mr. McMillan was unaware of this issue when he initially helped to prepare the Debtor's financial information for entry into the Peachtree accounting program. (ECF No. 1-14 at 61). He was also unaware that the $924,728.70 deposit was incorrectly recorded as a payment on a note owed to Debtor, ultimately reflecting a negative balance because the payment exceeded the debt. (ECF No. 1-14 at 67). Mr. McMillan believed

5

that the bookkeeping error was not caught and corrected, because Debtor's books were never fully reviewed for tax purposes for the 2010 tax year due to the bankruptcy proceedings. (ECF No. 1-14 at 59). Yearly reviews typically turned up errors in bookkeeping, and corrections would be made. (ECF No. 1-14 at 59). Mr. McMillan concluded his testimony by stating that he was aware of five or six other entities owned by Mr. Reinert which were jointly and severally liable with Debtor to Fifth Third Bank. (ECF No. 1-14 at 62).

Following the trial, an official transcript of the proceedings was filed on August 29, 2014. (ECF No. 1-14). The bankruptcy court issued its Memorandum Opinion and Order dismissing the Trustee's complaint with prejudice on November 19, 2014. (ECF Nos. 1-19, 1-20). In its decision, the bankruptcy court referred primarily to the Trustee's failure to demonstrate, via sufficient evidence, that Debtor was insolvent at the time the transfer to Midtown was made. (ECF No. 1-19 at 4). The Trustee filed his appeal in this court on December 23, 2014. (ECF No. 1). The Trustee filed a brief in support on January 23, 2015. (ECF No. 3). Appellees filed a response on February 19, 2015. (ECF No. 6). The matter is ripe for disposition.

### III. STANDARD OF REVIEW

Federal district courts have appellate jurisdiction over final judgments, orders, and decrees of the bankruptcy court. 28 U.S.C. § 158(a)(1). When a district court examines a bankruptcy court decision, legal determinations are reviewed *de novo*, factual findings for clear error, and discretion for abuse. *In re Jevic Holding Corp.*, 787 F. 3d 173, 179 (3d Cir. 2015) (citing *In re Goody's Family Clothing Inc.*, 610 F. 3d 812, 816 (3d Cir. 2010)). When a case involves mixed questions of law and fact, the court must "apply a clearly erroneous standard to integral facts, but exercise plenary review of the court's interpretation and application of those

facts to legal precepts." *Rock Airport of Pittsburgh, LLC v. Mgmt. Science Assc., Inc.*, 511 B.R. 746, 749 (W.D. Pa. 2014) (citing *In re Nortel Networks, Inc.*, 669 F. 3d 128, 137 (3d Cir. 2011)).

## IV. DISCUSSION

The Trustee seeks to avoid the transfers of funds from Debtor's account to the appellees, in accordance with § 548(a)(1)(B) and Section 5105. The central thrust of the Trustee's argument is that the bankruptcy court erred in determining that the Trustee failed to establish the factual predicate necessary for avoidance under those statutes. In its Memorandum Opinion, dated November 19, 2014, the bankruptcy court recognized that the Trustee brought claims against appellees under § 548(a)(1)(B) and Section 5105, alleging a constructively fraudulent conveyance to Midtown of property that was in actuality a part of Debtor's bankruptcy estate. The bankruptcy court, however, concluded that the Trustee had failed to satisfy his burden of advancing sufficient evidence to demonstrate that either statute had been violated.

First, the bankruptcy court noted that the financial schedules most heavily relied upon by the Trustee to substantiate the constructive fraudulent transfer claim were unverified. (ECF No. 1-19 at 5). Second, the schedules failed to address factors directly related to a determination of insolvency, including contingent liabilities, income from business activities, fair market value of assets, or expert testimony about any of these factors, including Debtor's potential liability for the $20 million judgment owed to Fifth Third Bank. (ECF No. 1-19 at 6 – 7). Third, Debtor's financial schedules pertained only to the point in time at which Debtor filed for bankruptcy, and no direct evidence was presented to demonstrate that insolvency existed at the time of the allegedly fraudulent transfers nearly one year prior. (ECF No. 1-19 at 7). Due to the lack of verifiable evidence about these and other factors, the bankruptcy court ultimately concluded that,

as a matter of law, the Trustee had not adduced sufficient evidence to meet his burden of demonstrating the insolvency of Debtor at the relevant time.

The Trustee's argument on appeal is two-fold. First, the Trustee alleges that credible evidence was introduced in the form of witness testimony, as well as financial schedules and a statement of financial affairs drafted by the Trustee's predecessor trustee, which satisfied the elements necessary for a *prima facie* showing of the existence of a constructively fraudulent transfer under § 548(a)(1)(B) and Section 5105. (ECF No. 3 at 9 – 16). Second, the Trustee asserts that the bankruptcy court's rejection of this admissible, uncontested evidence was inappropriate given appellees' failure to sustain their burden of providing rebuttal evidence. (*Id.*). Appellees counter that the Trustee simply failed to satisfy the elements of a *prima facie* claim of a constructive fraudulent transfer, and therefore, appellees had no obligation to rebut the Trustee's claims. (ECF No. 6 at 8 – 19). Based upon the present record, the court concludes that appellees are correct.

To prove a *prima face* claim of constructive fraudulent transfer, § 548(a)(1)(B) requires the Trustee to establish that "(1) the debtor had an interest in property; (2) a transfer of that interest occurred within one year of the bankruptcy filing; (3) the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer; and (4) the transfer resulted in no value for the debtor or the value received was not 'reasonably equivalent' to the value of the relinquished property interest." *Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F. 3d 203, 210 (3d Cir. 2006). The Trustee must ultimately prove each of these elements by a preponderance of the evidence. *Id.* at 211. The same elements will suffice to satisfy the requirements of Section 5105. *Image Masters, Inc. v. Chase Home Finance*, 489 B.R. 375, 386 –

87 (E.D. Pa. 2013) (citing *Fidelity Bond & Mortg. Co. v. Brand*, 371 B.R. 708, 719 – 20 (E.D. Pa. 2007)). The Trustee, again, has the burden of proof. *Titus v. Shearer*, 498 B.R. 508, 516 (W.D. Pa. 2013).

The Trustee's evidence was found deficient, as a matter of law, with respect to the above standard. As such, the court will review the bankruptcy court's application of the law to the undisputed facts presented by the Trustee *de novo*. *See United States v. Raddatz*, 447 U.S. 667, 690 (1980) (*de novo* review is an "independent determination of the issues," and the court will "not…give any special weight to the [prior] determination."). The court's analysis will begin with the third element of the *prima facie* claim, in light of the bankruptcy court's focus upon the Trustee's failure to provide adequate proof of insolvency.

Insolvency is defined as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(32)(A). This definition is referred to as the "balance sheet test," and a debtor's assets and liabilities are to be "tallied at a fair valuation." *Mellon Bank, N.A. v. Metro Commc'n, Inc.*, 945 F. 2d 635, 648 (3d Cir. 1991). When liquidation in bankruptcy is not "clearly imminent," fair valuation is determined on a "going concern" basis. *Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F. 3d 188, 193 (3d Cir. 1998) (citing *Moody v. Security Pacific Business Credit, Inc.*, 971 F. 2d 1056, 1067 (3d Cir. 1992) ("proper standard of valuation…is the value…as a going concern, not the liquidation value.")). Courts will generally look to fair market value in determining a fair valuation. *Id.* Courts must also consider contingent liabilities "arising from foreseeable events that might occur while the debtor remains a going concern." *Id.* at 197 – 98; *see Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F. 3d 139, 154 (3d Cir. 1996) (citing *Basic, Inc. v. Levinson*, 485 U.S. 224

(1988)) (the materiality of a contingency is determined by balancing probability against anticipated magnitude). Finally, a debtor's solvency is "measured at the time the debtor transferred value, not at some later or earlier time." *Official Comm. of Unsecured Creditors of R.M.L., Inc.*, 92 F. 3d at 154 (citing *Metro Commc'n, Inc.*, 945 F. 2d at 648).

It was conceded in trial testimony, as well as by the Trustee in his brief, that the financial schedules used to support the claim of a constructively fraudulent transfer pertained only to the financial situation of Debtor at the time of bankruptcy. These schedules purport to show Debtor's assets to be valued at $9,225,620.32 and liabilities to be valued at $31,123,603.29 as of May 2, 2011. (ECF Nos. 6 at 8). Presupposing that the above figures are, indeed, accurate, the Trustee attempts to connect these figures to the date of the allegedly fraudulent transfers made on July 16, 2010 in three ways: 1) by noting Mr. Shearer's testimony that the financial schedules were as accurate as possible under the circumstances and that Debtor's assets were combined with those of several other entities and together sold for only $5 million; 2) by noting Mr. McMillan's testimony that he believed the Debtor's financial condition to have been consistent from the time of the transfers to the time of Debtor's bankruptcy filing; and 3) by noting that the $20 million judgment owed jointly and severally to Fifth Third Bank by Debtor and at least five other entities predated the allegedly fraudulent transfers. (ECF No. 3 at 15 - 20). These arguments are easily addressed.

Mr. Shearer's statement that Debtor's financial schedules were "as accurate as they can reasonably be" (ECF No. 1-14 at 12), is not an affirmative statement of *actual* accuracy. The facts illustrate that the parties compiling Debtor's financials could not say whether generally accepted accounting principles were used in Debtor's bookkeeping, whether contingent liabilities were accounted for in the financial schedules, and whether the asset valuations in the financial

10

schedules reflected Debtor's valuation as an ongoing concern. Mr. Shearer's belief that Debtor's financial schedules were accurate to some inarticulable degree does not bolster the schedules' reliability for purposes of determining Debtor's insolvency at the time of the relevant transfers. His belief does not reference the factors to be considered in determining whether Debtor was insolvent at the relevant time. While Mr. McMillan may have believed that Debtor's financials did not change between the times of the transfers and filing for bankruptcy, to the degree he bases that assumption on Debtor's bookkeeping and financial schedules, the testimony is not reassuring.

While it is technically true that under the legal doctrine of joint and several liability Debtor may have been liable for the entire sum of the $20 million judgment which predated the allegedly fraudulent transfers at issue, there was no testimony to this affect, or to the likelihood of such an outcome. *See Travellers Int'l AG*, 134 F. 3d at 197 (agreeing with bankruptcy court that contingent liabilities may be considered in an amount discounted by the probability of the contingency occurring). The lack of evidence about an assessment of the amount of Debtor's likely liability diminishes the Trustee's argument that the judgment would have single-handedly rendered Debtor insolvent on July 16, 2010.

It is the Trustee's burden to establish each element of a *prima facie* claim by a preponderance of the evidence. *Pension Transfer Corp.*, 444 F. 3d at 210. The undisputed evidence adduced by the Trustee at trial is insufficient, as matter of law, to demonstrate Debtor's insolvency at the time the allegedly constructively fraudulent transfer was made on July 16, 2010. The court now finds that because the Trustee failed to carry his burden of satisfying the third element of a *prima facie* claim, appellees had no obligation to provide rebuttal evidence. The court's analysis need go no further.

## V.     CONCLUSION

Based upon the foregoing discussion, the bankruptcy court did err in finding that the Trustee failed to sustain his burden of demonstrating Debtor's insolvency on July 16, 2010, pursuant to § 548(a)(1)(B) and Section 5105.  Accordingly, the bankruptcy court's decision will be affirmed.

An appropriate order will follow.

*s/ Joy Flowers Conti*
Joy Flowers Conti
Chief United States District Judge

Dated: August 18, 2015
cc/ecf: All counsel of record;

    Honorable Jeffery A. Deller
    Chief United States Bankruptcy Judge